# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In the Matter of the Personal Restraint of | No. 51736-1-II |
| JAMES CHARLES MATHES, | UNPUBLISHED OPINION |
| Petitioner. | |

GLASGOW, C.J.—James Charles Mathes seeks relief from personal restraint imposed following his eight 2015 Pierce County convictions after an incident during which he kidnapped his girlfriend, assaulted her, and assaulted law enforcement officers by shooting at them.

In this personal restraint petition (PRP) proceeding, Mathes raises numerous arguments, including that the trial court abused its discretion by excluding expert testimony, Mathes's trial counsel rendered ineffective assistance of counsel, the trial court violated Mathes's speedy trial and time-for-trial rights, the trial court violated the appearance of fairness doctrine, and the State committed prosecutorial misconduct. We disagree with all of Mathes's arguments except for his argument that he is entitled to resentencing based on a corrected offender score.

Accordingly, we grant in part and deny in part Mathes's petition and remand for resentencing.

No. 51736-1-II

## FACTS[1]

### I. BACKGROUND

Mathes and Michelle Toste had a romantic relationship and a child in common. One evening, Mathes contacted Toste and told her to get a babysitter for their child because he wanted to see her. Both Mathes and Toste were aware of a no contact order in place prohibiting Mathes from contacting Toste, but the two regularly ignored the order. Eventually Toste found a babysitter, and Mathes picked her up and the two went to his mother's house.

Mathes and Toste had intercourse, and Mathes began asking Toste if she was having affairs. When Toste denied having any affairs, Mathes accused her of lying and became agitated. Mathes then reached underneath the mattress and pulled out a gun. Mathes injected what Toste believed to be heroin. Mathes and Toste went into the living room where they continued to talk. Mathes repeatedly asked Toste about her cheating, accused her of being married and having a baby, and accused Toste of lying when she denied having affairs.

In the middle of the night, Mathes asked Toste to find him some drugs so she called her daughter's best friend, Hannah. While on the phone with Hannah, Toste unsuccessfully tried to hint that she was in trouble. Later, Toste called her daughter, Stephanie, and asked about drugs and continued to hint that she was in trouble by saying, "'Bang, bang,'" but Stephanie did not understand. 2 Verbatim Report of Proceedings (VRP) at 200. Toste did not feel free to tell

---

[1] This opinion relies on the record from Mathes's direct appeal for the majority of the facts and uses the various exhibits and declarations Mathes and the State attached to their briefing as supplemental facts. *State v. Mathes*, No. 48401-3-II (Wash. Jan. 24, 2017), https://www.courts.wa.gov/opinions/pdf/D2%2048401-3-II%20Unpublished%20Opinion.pdf.

Stephanie what was going on or to leave the house because Mathes held the gun to her head while she was on the phone.

Early the next morning, Stephanie came to Mathes's parents' house and tried to get Toste to leave with her. Mathes told Stephanie that Toste "wasn't going nowhere," and Toste hugged Stephanie and whispered that Mathes had a gun. *Id.* at 202.

About an hour and a half later, Mathes and Toste got in his car and drove around. Toste asked Mathes to stop at her regular coffee shop where she tried to make eye contact with the employees to indicate she needed help. Toste did not ask for help directly because Mathes told her if she said anything he would shoot her and everyone else there.

Mathes and Toste drove around for about three hours. At one point, Mathes shot the gun out his window and told Toste it could have been her head.

Around noon, Mathes and Toste returned to Mathes's mother's house. Mathes's father, Roy, pulled into the driveway immediately after them. Mathes told Roy to go into the house with them and at one point put the gun to Roy's head. Stephanie returned to the house and Mathes asked her to find him $20,000.

Soon after, a 9-1-1 operator called the house. With the call on speaker and Mathes holding the gun to her back, Toste told the operator she was okay, she was not being held at gunpoint, and she could speak freely. The operator told them that law enforcement was outside and asked them all to go outside.

Mathes, Toste, Roy, and Stephanie went outside and saw several law enforcement officers. Mathes got into his car and ordered Toste to get in the car as well. The officers told Toste not to

get into the car. Mathes then got out of the car, reached over the top of the car, and fired his gun at the officers. Toste and Stephanie ran to the neighbor's carport and hid.

The officers fired at Mathes. Mathes dropped to the ground behind the car. The officers fired at Mathes again. The officers secured Mathes in handcuffs and assessed his injuries. Mathes had been shot and was transferred to the hospital. No one else was injured.

Because the incident involved shooting by law enforcement, the Washington State Patrol conducted the crime scene investigation. State Patrol Detective Rodney Green took possession of the weapons of the officers at the scene and determined that Kitsap County Sheriff Deputies Benjamin Herrin and Curtis Lont had fired their weapons. Detective Green collected evidence including bullet casings, a magazine for bullets, a handgun, clothing, and medical supplies. Through the use of maps, diagrams, and trajectory rods, Detective Green traced one bullet from Mathes's gun and an additional bullet hole in the corner of the garage that appeared to have come from where Mathes was standing by his car.

## II. TRIAL

### A.    Initial Procedure

Law enforcement arrested Mathes on December 31, 2013. On January 9, 2014, the State filed a felony complaint in district court charging Mathes with two counts of first degree assault and one count of unlawful imprisonment with a domestic violence sentencing enhancement.

On February 11, 2014, the district court docket shows the following entry: "Stipulation of defendant to defer bindover and extend jurisdictional time limits signed." PRP, Ex. 3A (capitalization omitted). The district court docket reads, "Docket continued on next page," but Mathes has not provided any subsequent pages. *Id.* (capitalization omitted).

4

On March 25, 2014, the State filed an information in superior court charging Mathes with two counts of first degree assault, each with a firearm sentencing enhancement, and one count of unlawful imprisonment with domestic violence and firearm sentencing enhancements. Mathes was arraigned, and he pleaded not guilty on March 28, 2014. There were multiple pretrial continuances, including one requested by the State due to schedule conflicts with the State's law enforcement witnesses. The case proceeded to trial in October 2015.

B.      Plea Negotiations

The State offered Mathes a plea deal wherein Mathes would plead guilty to two counts of first degree assault, each with a firearm sentencing enhancement, and one count of unlawful imprisonment with domestic violence and firearm sentencing enhancements, with a sentence recommendation of 471 months. Mathes rejected the offer.

The State continued negotiations with Mathes and his trial counsel. The State next offered to drop the firearm enhancement on the second first degree assault charge but add three additional charges—violation of a court order with a domestic violence sentencing enhancement, harassment with a domestic violence sentencing enhancement, and unlawful possession of a firearm. Under the second offer, the State would recommend a 367-month sentence and Mathes could argue for a 291-month sentence.

On September 24, 2015, Mathes met with his trial counsel and a member of Harris Investigations to discuss Mathes's plea offer. At the meeting, Mathes said that he would not accept the offer and that he wanted a sentence that did not include the first degree assault and firearm sentencing enhancement so that he could obtain more good time on his sentence. Mathes's trial counsel explained to Mathes that he would discuss this proposal with the State, but that it was

unlikely the State would drop the enhancements or the first degree assault charge. Mathes said that if the State would not make those changes, he would prefer to go to trial.

Mathes, Mathes's trial counsel, Harris Investigations, and the State met on October 1, 2015, to further discuss the plea offer so that Mathes could speak directly to the prosecutor. The State explained that it would not remove the first degree assault charges and that the State had already removed one of the firearm sentencing enhancements. The meeting concluded with the State encouraging Mathes to consider the offer "because if he did not, there [was] a likelihood that Mathes would be convicted and sentenced with much more time than the [plea] offer." Suppl. Br. of Pet'r, Ex. F. Everyone at the meeting agreed that if Mathes went to trial and was convicted, "he ha[d] very little hope of ever getting out of prison." *Id.*

Mathes chose to proceed to trial.

C.    Amended Information

Three days before trial, on October 19, 2015, the State filed an amended information charging Mathes with two counts of first degree assault with firearm and law enforcement victim sentencing enhancements, two counts of second degree assault (in the alternative) with firearm and law enforcement victim sentencing enhancements, first degree kidnapping with domestic violence and firearm sentencing enhancements, unlawful imprisonment (in the alternative to kidnapping) with domestic violence and firearm sentencing enhancements, second degree assault on Toste with domestic violence and firearm sentencing enhancements, second degree assault on Roy with domestic violence and firearm sentencing enhancements, felony violation of a court order with domestic violence and firearm sentencing enhancements, felony harassment with domestic violence and firearm sentencing enhancements, and unlawful possession of a firearm.

When asked about the amended information, Mathes's trial counsel did not object or indicate any surprise. Mathes's trial counsel acknowledged that he had reviewed the amended information with Mathes and was prepared to proceed to trial.

D.    Dr. Muscatel

Mathes sought to argue a diminished capacity defense and enlisted Dr. Kenneth Muscatel to offer his expert opinion.

Pretrial, Dr. Muscatel made the first of two offers of proof regarding Mathes's diminished capacity to form intent at the time of the incident. Dr. Muscatel testified that Mathes had a chronic mental disorder consistent with bipolar disorder and a very serious substance abuse problem. When asked his opinions regarding Mathes's mental state at the time of the incident relating to potential diminished capacity, Dr. Muscatel explained, "[W]hile his behavior was clearly intentional in the general sense, the question is whether he could have formed the intent to assault as opposed to engage in a bizarre version of self-defense. That's the only way that I think diminished capacity could possibly apply in this matter." 1 VRP at 86-87. He explained that diminished capacity would change depending on the specific charge.

Dr. Muscatel went on to explain,

> Now it's important that -- as you know, in my report, I don't state that he had diminished capacity, but rather stated that there were elements that have to be determined -- in the course of the evidence of the trial -- to determine what happened and how it happened. Because that will go a long way to determining whether he acted in a manner suggesting intentionality.
>
> . . . .
>
> So a lot of this is going to depend on the reality of the evidence. And I didn't feel like I could interpret that for the court. The documents were complicated enough that I thought this was one that I needed to defer.

7

. . . .

I thought there was plenty of evidence from a variety of sources that he was in a highly impaired mental state at the time of the incident. . . .

The question in this case is whether that prevented him from forming the requisite intent. That I could not answer for the court.

*Id.* at 88-89.

On cross-examination, Dr. Muscatel opined that as it relates to the charges of assault on the officers, he would be unable to present any opinion in terms of diminished capacity because it appeared to be intentional conduct. He testified that there was no diminished capacity defense for the violation of a no contact order charge and that the "foundation is weaker" for a diminished capacity defense for the harassment charge. *Id.* at 94.

The State asked Dr. Muscatel if he had an opinion if Mathes was able to form intent, and Dr. Muscatel responded that he did not.

Following the first offer of proof, the trial court ruled to exclude Dr. Muscatel's testimony because "I'm unable to find as a matter of foundation that Dr. Muscatel was able to testify to a reasonable medical certainty that Mr. Mathes was not able to form the specific intent. He doesn't know. And it's unclear to him at this point. And so I think that's problematic at this point in the case." *Id.* at 109. The trial court told Mathes that he could reraise the issue as the case progressed based on the evidence presented.

Later in trial, Mathes made a second offer of proof. During this second offer of proof, Dr. Muscatel reiterated that there was "no question" that Mathes suffers from a mental disorder. 5 VRP at 626. Mathes asked:

> [Mathes]: In your opinion, more probable than not, did that condition impair Mr. Mathes's ability to form the culpable mental state to commit the crimes charged?
>
> [Dr. Muscatel]: Would it impair him? Yes. Did it impair him? I don't know. This goes back to my original testimony.

*Id.* at 626-27.

On cross-examination, the State asked Dr. Muscatel if his opinion had changed from his first offer of proof. Dr. Muscatel responded,

> Not really, no. I mean, I can say that my degree of certainty about the presence of his mental disorder at the time, in and around the time of the incident, has deepened. That much I can say.
>
>   In terms of my overall opinion, I look at my results and it is essentially the same.
>
>   . . . .
>
>   So I still could not offer the opinion that he couldn't form the requisite intent, nor could I offer that he could.

*Id.* at 628-29.

The trial court again ruled to exclude Dr. Muscatel's testimony, explaining,

>   And so in this particular case, I'm not satisfied at this point that diminished capacity defense is available to Mr. Mathes. Again, I'm relying on the *Atsbeha*[2] case and the testimony of Dr. Muscatel. He's not able to offer based on his testimony, I believe, any opinion as to whether or not Mr. Mathes was capable of forming the requisite intent. If he's not able to offer an opinion on that, I don't believe it's relevant under [ER] 401, 402 and ER 702.

*Id.* at 641.

---

[2] *State v. Atsbeha*, 142 Wn.2d 904, 16 P.3d 626 (2001).

E.      Statements to Deputies at the Hospital

During trial, the State called Kitsap County Sheriff Deputies Brittany Gray and Eric Adams as witnesses. The deputies had been assigned to monitor Mathes while he was hospitalized until he was medically cleared to be moved to the jail.

Deputy Gray testified that when she entered Mathes's room, he asked her multiple times if he had hurt anyone and told her he had fired shots. She described his demeanor as coherent and explained that they casually discussed things unrelated to the case. The State asked Deputy Gray:

[State]: So did [Mathes] seem to be genuinely interested if anybody was hurt?

[Deputy Gray]: Yes.

[State]: Did he seem to care if anybody was hurt?

[Deputy Gray]: That's difficult for me to say, but he was definitely interested if someone had been hurt.

3 VRP at 492. According to Deputy Gray, Mathes told a nurse "I fired shots which put me in this position," and asked the nurse if he had hurt anybody. *Id.* At some point Mathes asked Deputy Gray whether she thought he should get an attorney, and Deputy Gray reminded Mathes of his rights. Mathes asked the nurse to call his attorney, and he used the phone in his hospital room to call his parents.

Deputy Adams testified that Mathes told him that it was important that he know that if Mathes had hurt anyone, it was an accident. The State asked Deputy Adams if Mathes seemed concerned about whether he had hurt anyone, and Deputy Adams answered that he was. Deputy Adams testified,

[H]e said that he did what he did because he wanted to get hurt himself, not hurt a cop. He said he didn't expect he would live when he went out guns-a-blazing.

10

. . . .

He didn't say specifically how many times he fired, but he said he emptied his gun.

. . . .

He said he remembered lying on the ground bleeding and hearing his dad crying. He said he was happy that his girlfriend got away and was not hurt. He said he tried to reload his gun with the bullets in his pocket because he had time, but he was unable.

*Id.* at 502-04.

On cross-examination, Mathes asked Deputy Adams:

[Mathes]: Deputy, isn't it true that Mr. Mathes brought up more than a couple times about his concern about anybody got hurt?

[Deputy Adams]: Yes.

[Mathes]: There was a number of times during a period of time you were there, correct?

. . . .

Didn't he also tell you that his intention was to hurt himself, not anybody else, especially the police?

. . . .

[Deputy Adams]: That's correct, he did. He said he did what he did because he wanted to get hurt himself, not hurt a cop.

*Id.* at 504-05.

F.      Verdict and Sentence

The jury found Mathes guilty on all the greater offenses as charged and answered all special allegations in the affirmative. With the exception of the court order violation and harassment counts, which were sentenced below the standard range, Mathes received a standard range sentence

totaling 720 months. This included consecutive sentencing on the two first degree assault convictions.

### III. REFERENCE HEARING

In 2018, Mathes sought relief from personal restraint by filing a timely petition in this court. We appointed him counsel who filed a supplemental brief. Upon review of the pleadings, we determined that a reference hearing was needed to resolve factual disputes. We remanded to the trial court for a reference hearing primarily regarding Mathes's claim that he received ineffective assistance of counsel during plea negotiations and at sentencing because his trial counsel failed to recognize that his offender scores were incorrect and failed to properly advise him about certain sentencing consequences.

The trial court held a reference hearing during which it considered briefing from the parties, testimony of witnesses, argument of counsel, and the records and files of the case. Following the reference hearing, the trial court entered the following findings of fact in response to questions posed by this court:

> The Court concludes and the parties agree that at the time of sentencing, Mr. Mathes's criminal history was incorrect because a prior [violation of uniform controlled substances act (VUCSA)] conviction was wrongly classified as a class B felony rather than as a class C felony that should have washed out. Mr. Mathes had "0" criminal history points prior to the convictions of this case.

Findings of Fact on Reference Hr'g (FOF) at 2.

The offender scores and standard ranges for the longest consecutive sentences for Mathes's most serious counts were as follows:

Count I: first degree assault with firearm enhancement:
- Offender Score: 5; standard range: 138-184 + 60 months firearm enhancement.

Count III: first degree assault, with firearm enhancement:
• Offender Score: 0; standard range: 93-123 + 60 months firearm enhancement.

Count V: kidnapping in the first degree with firearm enhancement:
• Offender Score: 0; standard range: 51-68 + 60 months firearm enhancement.

*Id.* at 3.

Mathes's remaining counts would run concurrently except their firearm enhancements would run consecutively:

• Counts I, III, and V run consecutive as serious violent offenses plus firearm enhancements: (198-244 + 153-183 + 111-128 = 462-555).

• Counts VII-XI concurrent, but firearm enhancements consecutive: (36 + 36 + 18 + 18 = 108).

Mr. Mathes's total standard range was 570-663 months.

. . . .

The State's best plea offer had a range of 23.5 to 31 years (282-372 months) of incarceration. The State would recommend a sentence of 30 years. Mr. Mathes would be able to argue for the bottom of the range. *Once the sentencing range could be agreed, the parties would agree on the charges that would result in the agreed sentencing range.*

Mr. Mathes was willing to accept a plea offer involving 15 to 20 years (180-240 months) of incarceration after allowing for good time credits.

. . . .

Defense counsel never correctly advised Mr. Mathes of his proper criminal history, offender scores, and standard ranges, but advised that everything would be much higher if he proceeded to trial.

Mr. Mathes was advised that the enhancements would run consecutively to the base sentence.

> During a negotiation meeting between Mr. Mathes, defense counsel, the defense investigator, and the prosecutor, they all discussed that the firearm enhancements would run consecutively.
>
> Mr. Mathes was willing to plead guilty to any combination of offenses that resulted in a sentence of 15 to 20 years after deductions for good time credit.

*Id.* at 3-5 (emphasis added).

## ANALYSIS

### I. MOTION TO STRIKE

As an initial matter, the State filed a motion to strike Mathes's reply brief, arguing that the reply brief presents new evidence and legal arguments for the first time.[3] Mathes concedes he improperly raised a new argument in his reply brief, he received ineffective assistance of counsel when his trial counsel prevented him from testifying, and he withdraws that issue from review. We accept Mathes's partial concession and strike the portion of his reply brief raising a new argument because we do not review issues first raised and argued in a reply brief. *In re Pers. Restraint of Rhem*, 188 Wn.2d 321, 327, 394 P.3d 367 (2017).

The State also argues that we should strike certain exhibits attached to the reply brief. Relying on RAP 9.11, the State argues that we should strike the declarations attached to Mathes's reply brief. RAP 9.11 governs when the appellate court may direct a trial court to take additional evidence. RAP 9.11, is not, however, applicable to PRPs, and the State does not offer any other basis for broadly striking these declarations. *See* RAP 16.17.

---

[3] A commissioner of our court ruled that the motion would be considered when the petition is considered on the merits.

The State argues that exhibit B to Mathes's reply brief "contains hearsay" and objects to consideration of the hearsay. State's Mot. to Strike Reply Br. at 4. The State does not identify the alleged hearsay, or provide citation to the record or authority to support its argument. We do not consider the State's claim in the absence of supporting argument or citation to the record or authority. RAP 10.3; *State v. Cox*, 109 Wn. App. 937, 943, 38 P.3d 371 (2002).

The State also objects to exhibit D to Mathes's reply brief. Exhibit D contains three articles: (1) an article titled "Facts about Methamphetamine," from the Board of Cuyahoga County in Cleveland, Ohio; (2) an article from DrugRehab.com titled "How Long Does Meth Last?;" and (3) an article from the National Center for Biotechnology Information, the Journal of Neuroimmune Pharmacology, titled "Methamphetamine-Associated Psychosis." Reply Br. of Pet'r, Ex. D. In response, Mathes argues that the articles are admissible under ER 201, which allows the court to take judicial notice of adjudicative facts. Mathes asks us to take judicial notice of the fact that methamphetamine intoxication could persist from 6 hours up to 24 hours.

"Washington judges are permitted to take judicial notice of 'adjudicative facts.'" *State v. N.B.*, 7 Wn. App. 2d 831, 835, 436 P.3d 358 (2019) (quoting ER 201(a)). Such a fact "must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." ER 201(b). The court can take judicial notice on its own and at any stage of proceedings. ER 201(c), (f); *N.B.*, 7 Wn. App. 2d at 835. Except for citing ER 201, Mathes does not provide argument or citation to authority to support his request. As a result, we decline taking judicial notice of the duration of methamphetamine intoxication. ER 201(b); *see In re Marriage of Meredith*, 148 Wn. App. 887, 904, 201 P.3d 1056 (2009)

("Information contained on these Internet sites are not 'generally known' or from a 'source[] whose accuracy cannot reasonably be questioned.'" (alteration in original)).

In sum, we accept Mathes's partial concession and grant the State's motion to strike Mathes's new argument, and we decline to take judicial notice of the duration of methamphetamine intoxication. We deny the remainder of the State's motion to strike.

## II. PRP

### A.     Legal Principles

The petitioner carries the initial burden to support their PRP. RAP 16.4; *In re Pers. Restraint of Lord*, 152 Wn.2d 182, 188, 94 P.3d 952 (2004). A petitioner must prove either a constitutional error that results in actual and substantial prejudice or a nonconstitutional error that constitutes a fundamental defect which inherently results in a complete miscarriage of justice. *In re Pers. Restraint of Swagerty*, 186 Wn.2d 801, 807, 383 P.3d 454 (2016). The petitioner must prove the error by a preponderance of the evidence. *Lord*, 152 Wn.2d at 188. In addition, the petitioner must support the petition with facts or evidence and may not rely solely on conclusory allegations. *In re Pers. Restraint of Yates*, 177 Wn.2d 1, 18, 296 P.3d 872 (2013); *see* RAP 16.7(a)(2)(i).

In evaluating PRPs, we may dismiss the petition if the petitioner fails to make a prima facie showing of constitutional or nonconstitutional error, remand for a hearing if the petitioner makes a prima facie showing but the merits of the contentions cannot be determined solely from the record, or grant the PRP without further hearing if the petitioner has proved actual prejudice or a miscarriage of justice. *In re Pers. Restraint of Stockwell*, 160 Wn. App. 172, 176-77, 248 P.3d 576 (2011).

B.      Issues Addressed on Direct Appeal

Mathes raises several arguments in his PRP and his supplemental brief that he already raised and that we rejected on direct appeal. Accordingly, we do not consider Mathes's arguments that (1) the trial court abused its discretion by excluding Dr. Muscatel's expert opinion, (2) his trial counsel rendered ineffective assistance for failing to suppress Mathes's statements to law enforcement at the scene and at the hospital, (3) his trial counsel rendered ineffective assistance by failing to request a voluntary intoxication instruction, and (4) the State committed prosecutorial misconduct by misstating its burden to prove intent during closing argument.

"[A] personal restraint petitioner may not renew an issue that was raised and rejected on direct appeal unless the interests of justice require relitigation of that issue." *In re Pers. Restraint of Lord*, 123 Wn.2d 296, 303, 868 P.2d 835 (1994). A "ground for relief" is a distinct legal basis for granting relief and is considered "raised and rejected on direct appeal if the same ground presented in the petition was determined adversely to the petitioner on appeal and the prior determination was on the merits." *In re Pers. Restraint of Davis*, 152 Wn.2d 647, 671 n.14, 101 P.3d 1 (2004).

The interests of justice are served by reconsidering a ground for relief if there has been an intervening material change in the law or some other justification for having failed to raise a crucial point or argument on appeal. *Yates*, 177 Wn.2d at 17; *In re Pers. Restraint of Gentry*, 137 Wn.2d 378, 388, 972 P.2d 1250 (1999). Newly discovered evidence also may justify renewing an issue considered and rejected on appeal. *In re Pers. Restraint of Benn*, 134 Wn.2d 868, 886, 952 P.2d 116 (1998). However, besides showing the materiality of the evidence and the probability of its

17

effect on the trial result, the petitioner must also show that the evidence could not have been discovered in time to be included in the record on direct appeal. *Id.*

Here, Mathes has not shown that any of these repeat arguments rely on a change in the law or newly discovered evidence that could not have been discovered in time to perfect the record for the direct appeal. Mathes fails to demonstrate that the interests of justice require relitigation of the issues fully considered and disposed of on the merits in his direct appeal.

C.    Ineffective Assistance of Counsel

To prevail on an ineffective assistance of counsel claim, Mathes must show that trial counsel's performance was deficient and that Mathes was prejudiced by the deficient performance. *In re Pers. Restraint of Crace*, 174 Wn.2d 835, 840, 280 P.3d 1102 (2012) (citing *Strickland v. Washington*, 466 U.S. 668, 700, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984)). A petitioner demonstrates deficient performance by showing that defense counsel's conduct fell below an objective standard of reasonableness. *In re Pers. Restraint of Rice*, 118 Wn.2d 876, 888, 828 P.2d 1086 (1992). "In this regard, the court must make every effort to eliminate the distorting effects of hindsight and must strongly presume that counsel's conduct constituted sound trial strategy." *Id.* at 888-89. In addition, to show deficient performance, the petitioner must show the absence of any conceivable legitimate trial tactic explaining counsel's performance. *State v. Grier*, 171 Wn.2d 17, 33, 246 P.3d 1260 (2011).

To demonstrate prejudice, Mathes must show a "'reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome.'" *Crace*, 174 Wn.2d at 840 (quoting *Strickland*, 466 U.S. at 694). Prejudice does not require a showing that

counsel's actions more likely than not altered the outcome, but the likelihood of a different result must be substantial, not just conceivable. *Harrington v. Richter*, 562 U.S. 86, 112, 131 S. Ct. 770, 178 L. Ed. 2d 624 (2011). "[I]f a personal restraint petitioner makes a successful ineffective assistance of counsel claim, he has necessarily met his burden to show actual and substantial prejudice" under the standard for PRPs. *Crace*, 174 Wn.2d at 846-47.

      1.        <u>Failure to impeach with perjury</u>

Mathes argues that his trial counsel rendered ineffective assistance by failing to impeach Toste and Detective Green with inconsistencies in the testimony or evidence. We disagree.

Mathes points to a text message exchange between Stephanie and her friend, wherein Stephanie's friend asks, "Did you already drop [Toste] off?" PRP, Ex. 4B. He argues that the text message shows that Stephanie dropped Toste off at Mathes's house as opposed to Mathes picking up Toste from her house, and therefore Toste perjured herself when she testified that he picked her up. Mathes also appears to argue that Detective Green committed perjury. To support his claim, Mathes points to inconsistencies between Detective Green's testimony at trial and police incident reports, as well as inconsistencies between the testimonies of various witnesses. But conflicting witness testimony does not demonstrate that a witness committed perjury. *In re Pers. Restraint of Monschke*, 160 Wn. App. 479, 498, 251 P.3d 884 (2010). And we leave credibility determinations to the trier of fact and do not review them on appeal. *Id*.

Moreover, Mathes cannot carry his burden to show that, had trial counsel attempted to impeach Toste with this evidence, the result of the proceeding would have differed. Mathes contends that this evidence undercuts the State's evidence that he abducted Toste, as required to prove first degree kidnapping. However, the record reflects that the State did not base its theory of

kidnapping on Mathes picking up Toste. Rather, the kidnapping occurred after Toste and Mathes had been together for a period of time and Mathes pulled a gun on her and would not let her leave. How Toste and Mathes initially met was not a material fact in the case.

Accordingly, Mathes's argument that his trial counsel rendered ineffective assistance for failing to impeach Toste fails.

### 2.    Same criminal conduct

Mathes argues that his trial counsel rendered ineffective assistance by failing to argue that his second degree assault and harassment convictions constituted the same criminal conduct. We disagree.

A same criminal conduct determination affects the standard range sentence by altering the offender score. Former RCW 9.94A.589(1)(a) (2013). If a person is convicted of multiple current offenses, generally the sentencing court calculates all other current and prior convictions as prior convictions for the purpose of the offender score. *Id*. But if the sentencing court finds that some current offenses are the same criminal conduct, those current offenses are counted as one crime. *Id*. "Same criminal conduct" means "crimes that require the same criminal intent, are committed at the same time and place, and involve the same victim." *Id*.

We first look to the underlying statutes to determine whether the intents of each statute, if any, are the same or different for each crime. *State v. Chenoweth*, 185 Wn.2d 218, 223, 370 P.3d 6 (2016). If the intents differ, the current convictions are not the same criminal conduct. *Id.*; former RCW 9.94A.589(1)(a).

The charge of felony harassment required the State to prove that Mathes "knowingly threaten[ed]" his victim. RCW 9A.46.020(1)(a). Second degree assault requires that a person

intentionally assault another. *State v. Reed*, 168 Wn. App. 553, 574, 278 P.3d 203 (2012). To knowingly threaten someone is a distinct intent from intentionally assaulting someone, such that these crimes do not involve the same criminal intent.

Because felony harassment and second degree assault involve distinct criminal intents, felony harassment and second degree assault were not the same criminal conduct, and therefore Mathes's trial counsel did not render ineffective assistance by failing to argue that they were.

3.    Failure to move for continuance or dismissal

Mathes also argues that he received ineffective assistance of counsel because his trial counsel failed to move for a continuance or dismissal when the State filed its amended information three days before trial.[4] We disagree.

CrR 2.1 allows the State to amend the charging information at any time before the verdict provided that such amendment does not prejudice a substantial right of the defendant. Washington courts have recognized that a delayed filing of an amended information may prejudice a defendant. For example, in *State v. Michielli*, the Washington Supreme Court held that the defendant "was prejudiced in that he was forced to waive his speedy trial right and ask for a continuance to prepare" when the State filed an amended information bringing "surprise charges" three days before the scheduled trial. 132 Wn.2d 229, 244, 937 P.2d 587 (1997). There, the defendant objected to the amended information, requested a continuance, and moved to dismiss the additional charges. *Id.* at 233-34.

---

[4] In his pro se petition, Mathes argues that the trial court impermissibly violated his speedy trial rights by allowing the State to file its amended information. Because Mathes did not object to the filing of the amended information, or otherwise raise this issue below, we only address it in the ineffective assistance of counsel context. RAP 2.5.

In contrast to *Michielli*, Mathes fails to demonstrate how the late filing of the amended information prejudiced him. The record shows that Mathes's counsel acknowledged receipt of an advance copy of the amended information, had reviewed the amended information with Mathes, had no objection to the filing of the amended information, and was prepared to move forward with a not guilty plea and proceed with trial. Nothing in the record suggests that the amended information was a surprise to trial counsel or Mathes. Mathes's right to a speedy trial was not violated, delayed, or waived. There is no indication that Mathes was forced to go to trial unprepared, or forced to ask for a continuance to prepare for the additional charges. *See id.* Thus, we hold that Mathes's claim of ineffective assistance of counsel based upon not moving for a continuance or for dismissal fails.

4.       <u>Advice during plea negotiations</u>

Mathes contends that his trial counsel rendered ineffective assistance by failing to properly advise Mathes during plea negotiations. Specifically, he argues that trial counsel failed to properly calculate Mathes's offender score and did not properly explain the effect of potential firearm sentencing enhancements. We disagree.

"The right to effective assistance of counsel extends to the plea bargaining process." *State v. Drath*, 7 Wn. App. 2d 255, 266, 431 P.3d 1098 (2018). This includes "'assisting the defendant in making an informed decision as to whether to plead guilty or to proceed to trial.'" *State v. Estes*, 188 Wn.2d 450, 464, 395 P.3d 1045 (2017) (quoting *State v. A.N.J.*, 168 Wn.2d 91, 111, 225 P.3d 956 (2010)).

a.     Offender score

Mathes argues that his trial counsel's failure to properly calculate Mathes's offender score during plea negotiations prevented Mathes from intelligently assessing his options, and as a result, he is entitled to a new trial. Because Mathes cannot show that trial counsel's failure to calculate the offender score prejudiced Mathes, we disagree.

In the context of plea negotiations, a petitioner alleging ineffective assistance of counsel must show that the outcome of the plea process would have been different with competent advice from counsel. *Drath*, 7 Wn. App. 2d at 267. "'In these circumstances a defendant must show that but for the ineffective advice of counsel there is a reasonable probability that the plea offer would have been presented to the court.'" *Id.* (quoting *Lafler v. Cooper*, 566 U.S. 156, 164, 132 S. Ct. 1376, 182 L. Ed. 2d 398 (2012)).

Mathes contends that "[w]ith proper advice and scoring, Mr. Mathes likely would have accepted a plea offer to a lower quantum of time." Suppl. Br. of Pet'r at 28. However, the record does not support his argument. The plea-related documents attached to the supplemental brief demonstrate that Mathes was unwilling to accept any plea that included a conviction for first degree assault with a firearm sentencing enhancement. But the fact that Mathes had rejected plea offers does not necessarily evidence an unwillingness to engage in the plea bargaining process. *See Drath*, 7 Wn. App. 2d at 268 ("[A] defendant's perspective toward resolving his or her case through plea bargaining might very well change over the course of his or her case."). However, nothing in the record suggests that had trial counsel presented a correct offender score the State would have offered a plea to a lower quantum of time.

Following the reference hearing, the trial court found that Mathes was willing to accept a plea offer involving a sentence of 15 to 20 years and that the best offer the State was willing to make was a recommendation of 30 years. Nothing in the record supports Mathes's contention that either party's position was based on the miscalculated offender score. Rather, the record is clear that the State's best offer involved whatever combination of charges would carry a sentence of 30 years, regardless of the offender score. *See* FOF at 4 ("Once the sentencing range could be agreed, the parties would agree on the charges that would result in the agreed sentencing range.") And despite meetings where Mathes was warned that going to trial could lead to a significantly higher sentence, he maintained his position that he was only willing to accept a plea offer of 15 to 20 years.

So, while properly calculating Mathes's offender score was likely deficient performance, Mathes cannot show that under a proper offender score, the State would have presented an offer that Mathes likely would have accepted. Because Mathes fails to show that there is a reasonable probability that the outcome of the plea process would have been different, we hold that his argument fails.

b.      Firearm sentencing enhancements

Mathes also argues that trial counsel's advice during plea negotiations was deficient and prejudicial because trial counsel failed to fully explain the impact of the multiple potential firearm sentencing enhancements. We disagree.

Mathes contends that he "was unaware that all of the enhancements were mandatory, involved straight-time, and had to be served before the time on the underlying offenses." Suppl. Br. of Pet'r at 30. The plea-related documents attached to Mathes's supplemental brief show that

Mathes was aware of the impact sentencing enhancements have on a sentence. For instance, one of Mathes's primary focuses during negotiations was to not have any firearm sentencing enhancements included in his plea so he could qualify for more good time on his sentence.

Again, the record shows that Mathes was aware that not agreeing to the plea offer and proceeding to trial would expose him to a significantly greater sentence. *See id.*, Ex. F ("It was agreed by everyone that if Mathes goes to trial and if he is convicted he has very little hope of ever getting out of prison."). Thus, the record does not support Mathes's contention that his trial counsel failed to advise him of the potential charging of additional sentencing enhancements or of the impact such enhancements would have on his sentence.

Additionally, following the reference hearing, the trial court found that trial counsel advised Mathes that his sentencing liability would be much higher if he proceeded to trial and specifically that the sentencing enhancements would run consecutively to his base sentence. And the trial court found that during the negotiation meeting among Mathes, trial counsel, the defense investigator, and the prosecutor, "they all discussed that the firearm enhancements would run consecutively." FOF at 5. Notably, this finding was not limited to the enhancements running consecutively to the base sentence.

Moreover, Mathes cannot show that any deficient performance by his trial counsel prejudiced him. Mathes contends that "[h]ad counsel properly advised him, Mr. Mathes likely would have accepted the plea offer." Suppl. Br. of Pet'r at 30. But nothing in the record suggests that Mathes took his position on the State's plea offers due to a misunderstanding of his potential charges or sentence.

Accordingly, we hold that Mathes's claim of ineffective assistance on this ground fails.

   5.   Evidence of Mathes's mental health

Mathes next argues that his trial counsel rendered ineffective assistance by failing to admit helpful evidence to support Mathes's diminished capacity defense and by moving to suppress helpful testimony. We disagree.

The record reflects that trial counsel made numerous tactical decisions regarding what evidence to bring forward and what evidence to suppress. Whether counsel should have offered some additional evidence, or opted not to suppress some evidence, is the sort of hindsight analysis we avoid. *See Rice*, 118 Wn.2d at 888-89. Mathes argues that because we held on direct appeal that trial counsel's decision *not to suppress* all of Mathes's statements to police was a legitimate trial strategy, it necessarily follows that counsel's *failure to obtain admission of* all of Mathes's statements must be deficient performance. In addition, Mathes presumes evidence of statements he made in the hospital would have supported a diminished capacity defense, but given Dr. Muscatel's opinion, Mathes was not presenting a diminished capacity defense to the jury. Thus, it was a conceivably legitimate tactical decision not to spotlight some of the more harmful things Mathes said after the shooting that might have instead supported his guilt. We will not find deficient performance where counsel's actions can be categorized as any conceivable legitimate trial tactic; it need not be the case that counsel's tactical decisions were perfect when viewed through the rose-colored lenses of hindsight. *Grier*, 171 Wn.2d at 33.

Given our strong presumption that counsel's conduct constituted sound trial strategy, we hold that Mathes's ineffective assistance argument on this ground fails.

6. <u>Preparing Dr. Muscatel</u>

Mathes contends that his trial counsel rendered ineffective assistance by failing to adequately prepare Dr. Muscatel. We disagree.

Mathes cannot show that providing Dr. Muscatel Mathes's mental health history would have changed his opinion to make it admissible. In support of his petition, Mathes's appointed counsel's office contacted Dr. Muscatel to determine whether his opinion might have changed had trial counsel forwarded Mathes's mental health history. According to appointed counsel, Dr. Muscatel responded that he reviewed the materials and ultimately "was more convinced that Mr. Mathes exhibited the foundational elements for diminished capacity, but he still could not offer an opinion as to the specific circumstances." Suppl. Br. of Pet'r at 18. This is not materially different from Dr. Muscatel's opinion offered at trial during either of Mathes's offers of proof.

Although Mathes acknowledges that Dr. Muscatel's conclusions would not have changed in light of the new information, Mathes points to a newly produced opinion of Dr. Philip Barnard to support his argument. *See id.*, Ex. K. However, a differing opinion of a different expert does not support Mathes's argument that had trial counsel provided Dr. Muscatel with more information related to Mathes's mental health history that Dr. Muscatel's opinion would have differed when Dr. Muscatel himself acknowledges that it would not.

Accordingly, because Mathes cannot show that had his trial counsel provided Dr. Muscatel with the records of his mental health history Dr. Muscatel's opinion would have differed, we hold that Mathes's argument for ineffective assistance on this ground fails.

7.      Sentencing

Mathes argues that his trial counsel rendered ineffective assistance during sentencing by failing to secure a presentence report and by acquiescing to an incorrect offender score and unlawful sentence. We agree and remand for resentencing.

a.      Offender score

Mathes argues that his trial counsel rendered ineffective assistance by failing to object to an incorrect offender score at sentencing. The State concedes that Mathes was sentenced with an improper offender score and that this case should be remanded for resentencing. We accept the State's concession.

Following the reference hearing, the trial court found that at the time of sentencing, Mathes's criminal history was incorrect because it included a prior VUCSA conviction that was wrongly classified as a class B felony rather than as a class C felony that should have washed out. Properly calculated, Mathes had "0" criminal history points prior to the convictions of this case.

Nonetheless, trial counsel acquiesced to the State's improper inclusion of the prior conviction in calculating Mathes's offender score. As a result, the trial court miscalculated Mathes's standard range and imposed an unlawful sentence. Accordingly, we hold that trial counsel rendered ineffective assistance by acquiescing to the incorrect offender score, the ineffective assistance was prejudicial, and we must remand for resentencing.

b.      Presentence report

Mathes contends that his trial counsel rendered ineffective assistance at sentencing by failing to secure a presentence report under RCW 9.94A.500. Because we remand for resentencing based on Mathes's incorrect offender score, and because substantial evidence that Mathes suffered

from chemical dependency and mental illness exists in the record, we further direct the sentencing court to determine the appropriateness of a presentence report and chemical dependency screening.

RCW 9.94.500(1) provides:

> Unless specifically waived by the court, the court shall order the department to complete a chemical dependency screening report before imposing a sentence upon a defendant who has been convicted of . . . *any felony where the court finds that the offender has a chemical dependency that has contributed to his or her offense. . . .* If the court determines that the defendant *may be a mentally ill person* as defined in RCW 71.24.025, although the defendant has not established that at the time of the crime he or she lacked the capacity to commit the crime, was incompetent to commit the crime, or was insane at the time of the crime, the court *shall order* the department to complete a presentence report before imposing a sentence.

(Emphasis added.)

The role of drugs, chemical dependency, and mental illness on Mathes's life and offense were a constant theme throughout Mathes's trial. Dr. Muscatel testified that there was "no question" that Mathes suffers from a mental disorder and that the mental disorder existed in and around the time of the incident. 5 VRP at 626. Dr. Muscatel also noted that Mathes was likely "most acutely affected by the role of drugs, substances, rather than the underlying mental disorder that he had." *Id*. at 632. And Mathes, individuals who spoke in support of Mathes, and trial counsel discussed Mathes's chemical dependency and mental illness at sentencing.

The trial court did not make any specific findings regarding chemical dependency or mental illness. And counsel did not request a presentence report, or request that the trial court find that chemical dependency contributed to Mathes's offense. "In the absence of any presentence investigation, we can only speculate as to what information a report might have contained and what effect that information might have had on the outcome." *State v. Brown*, 178 Wn. App. 70,

80-81, 312 P.3d 1017 (2013). We hold that on remand, the sentencing court should determine whether a presentence report and a chemical dependency screening are required.

### 8. Cumulative error

Mathes next argues that the cumulative effect of trial counsel's deficiencies prejudiced him.

The cumulative error doctrine is limited to instances where several trial errors, standing alone, do not warrant reversal, but when combined deny the defendant a fair trial. *State v. Weber*, 159 Wn.2d 252, 279, 149 P.3d 646 (2006). We hold that Mathes has not demonstrated multiple errors by trial counsel such that Mathes was denied a fair trial.

### D. Speedy Trial and Time-for-Trial Rights

In his pro se petition, Mathes argues that the trial court violated both his speedy trial and time-for-trial rights.[5] Specifically, Mathes argues that he was not timely brought to trial due to an improper use of the preliminary hearings process and an erroneous use of the bind over process, an improperly granted continuance, and governmental misconduct.

### 1. Legal principles

We review de novo constitutional speedy trial claims. *State v. Iniguez*, 167 Wn.2d 273, 280, 217 P.3d 768 (2009). Both the federal and state constitutions guarantee a criminal defendant the right to a speedy trial. U.S. CONST. amend. VI; WASH. CONST. art. I, § 22. "It is recognized that some pretrial delay is often 'inevitable and wholly justifiable.' However, the nature of the speedy trial right, which has been described as 'amorphous,' 'slippery,' and 'necessarily relative,'

---

[5] Mathes does not distinguish between the two claims in his argument.

makes it difficult to articulate at what point too much delay has occurred." *Iniguez*, 167 Wn.2d at 282 (internal quotation marks omitted) (quoting *Doggett v. United States*, 505 U.S. 647, 656, 112 S. Ct. 2686, 120 L. Ed. 2d 250 (1992); *Vermont v. Brillon*, 566 U.S. 81, 89, 129 S. Ct. 1283, 173 L. Ed. 2d 231 (2009)).

For us to determine a speedy trial claim, the defendant must first show that the length of delay in bringing him to trial crossed the line from ordinary to presumptively prejudicial. *Id.* at 283. Once the defendant shows that the trial court's delay was presumptively prejudicial, we examine the nature of the court's delay to determine whether a constitutional violation occurred. *Id.*

The threshold for a constitutional speedy trial violation is higher than for a violation of the time-for-trial court rules. *State v. Smith*, 165 Wn. App. 296, 324, 266 P.3d 250 (2011). While the time-for-trial court rules are founded upon the constitutional right to a speedy trial, they are not of constitutional magnitude. *State v. Ollivier*, 178 Wn.2d 813, 823, 312 P.3d 1 (2013). Moreover, there is "no constitutional basis for holding that the speedy trial right can be quantified into a specified number of days or months." *Barker v. Wingo*, 407 U.S. 514, 523, 92 S. Ct. 2182, 33 L. Ed. 2d 101 (1972).

We review a trial court's application of CrR 3.3, the time-for-trial rule, de novo. *Ollivier*, 178 Wn.2d at 826. We review a trial court's decision to grant a continuance for an abuse of discretion. *Id.* at 822-23. A trial court abuses its discretion if its decision is based on untenable grounds or for untenable reasons. *State v. Nguyen*, 131 Wn. App. 815, 819, 129 P.3d 821 (2006).

Under CrR 3.3, a defendant held in custody pending trial must be tried within 60 days of arraignment. CrR 3.3(b)(1)(i); *Ollivier*, 178 Wn.2d at 823. Continuances granted by the trial court

are excluded from the computation of time. CrR 3.3(e)(3). The trial court may grant a party's motion to continue the trial date when it "is required in the administration of justice and the defendant will not be prejudiced in the presentation of his or her defense." CrR 3.3(f)(2). In granting the continuance, the trial court must "state on the record or in writing the reasons for the continuance." *Id.* "The bringing of such motion by or on behalf of any party waives that party's objection to the requested delay." *Id.*

       2.        District court, preliminary proceedings, and bind over

Mathes makes arguments related to the preliminary hearings process, and the bind over process from district court to superior court. Mathes relies on inapplicable law, and fails to provide a sufficient record to review his arguments.

Mathes contends that his speedy trial and time-for-trial rights were violated based on RCW 10.46.010, CrR 3.3, and *State v. McIntyre*,[6] *State v. Striker*,[7] and *State v. Edwards*,[8,9] but his reliance is misplaced. RCW 10.46.010 was repealed by the Laws of 1984, chapter 76, section 29. *McIntyre*, *Striker*, and *Edwards* are based on a former version of CrR 3.3, which designated the date of arrest as the initial commencement date. *Compare Edwards*, 94 Wn.2d at 210; *McIntyre*,

---

[6] *State v. McIntyre*, 92 Wn.2d 620, 600 P.2d 1009 (1979).

[7] *State v. Striker*, 87 Wn.2d 870, 557 P.2d 847 (1976).

[8] *State v. Edwards*, 94 Wn.2d 208, 616 P.2d 620 (1980).

[9] Mathes also references "*State v. Christopher*," but we cannot confirm a case citation.

92 Wn.2d at 623; *Striker*, 87 Wn.2d at 871, *with* current CrR 3.3 ("The initial commencement date shall be the date of arraignment.").

Although Mathes argues that the time-for-trial is calculated from the date of arrest, he is incorrect.[10] The time-for-trial is calculated from the date of arraignment. CrR 3.3; CrRLJ 3.3.

Mathes has not provided a sufficient record of his district court proceedings to evaluate his claims that the preliminary proceedings and bind over process violated speedy trial principles or time-for-trial rules. To calculate the time-for-trial, we would need to review the district court proceedings, any stipulations for bind over, continuances, or other events that impacted the procedures. *See* CrR 3.3(c), (d), (e), (f); *see also* CrRLJ 3.3. On February 11, 2014, the district court docket shows the following entry: "Stipulation of defendant to defer bindover and extend jurisdictional time limits signed." PRP, Ex. 3A (capitalization omitted). The district court docket reads, "Docket continued on next page," but Mathes has not provided any subsequent pages. *Id.* (capitalization omitted). Thus, the only record we have suggests that Mathes stipulated to a delay in bind over and relevant time limits.

Because he fails to provide a sufficient record, Mathes fails to meet his burden of establishing that the claimed error is a fundamental defect resulting in a complete miscarriage of justice or actual prejudice. *See Yates*, 177 Wn.2d at 17.

3. Continuances

Mathes states that his speedy trial and time-for-trial rights were violated because the trial court granted the State's motion for a continuance. Citing *State v. Adamski*, 111 Wn.2d 574, 577,

---

[10] A former version of CrR 3.3 provided that the time for trial was to be calculated from the date of arrest. *McIntyre*, 92 Wn.2d at 623.

761 P.2d 621 (1988), he argues that the State's request was unreasonable because it was based on prosecution witnesses who should have been subpoenaed and who ultimately did not testify at trial.

The docket indicates that several continuances occurred. And as Mathes notes, the State moved to continue trial due to the unavailability of law enforcement witnesses. But, beyond the docket and the State's motion, Mathes does not provide a sufficient record for us to determine whether the trial court erred by granting continuances. Mathes fails to establish that the claimed error is a fundamental defect resulting in a complete miscarriage of justice or actual prejudice. *See Yates*, 177 Wn.2d at 17. His argument fails.

4.    Misconduct by the State

Mathes contends the State's mismanagement of the evidence and multiple amendments of the charges without good cause led to a lengthy delay in trial, and improperly forced Mathes to choose between his speedy trial rights and his right to effective assistance of counsel, requiring reversal under CrR 8.3. He claims that the State's actions constituted governmental misconduct under *Michielli*, 132 Wn.2d at 229, and that this misconduct forced him to waive his constitutional speedy trial rights to ensure his counsel was adequately prepared, requiring reversal and dismissal of the charges.

A trial court may dismiss charges under CrR 8.3(b) if the defendant shows by a preponderance of the evidence arbitrary action or governmental misconduct and prejudice materially affecting the defendant's right to a fair trial. *State v. Rohrich*, 149 Wn.2d 647, 654, 71 P.3d 638 (2003). Governmental misconduct need not be evil or dishonest—simple mismanagement is sufficient. *State v. Blackwell*, 120 Wn.2d 822, 831, 845 P.2d 1017 (1993).

Dismissing charges under CrR 8.3(b) is an extraordinary remedy that is limited to truly egregious cases of mismanagement. *Rohrich*, 149 Wn.2d at 658; *State v. Wilson*, 149 Wn.2d 1, 9, 65 P.3d 657 (2003). CrR 8.3 provides a mechanism for the State or the defendant to move the trial court to dismiss charges, or for the trial court to dismiss charges sua sponte. But Mathes does not provide authority for the proposition that CrR 8.3 provides a basis for reversal when raised for the first time in a PRP. Moreover, Mathes has not presented sufficient evidence or argument to establish misconduct on this record. Accordingly, we hold that his claim of governmental misconduct for purposes of CrR 8.3 fails.

E.    Appearance of Fairness

Mathes argues that the trial court violated the doctrine of appearance of fairness. Specifically, Mathes contends that the trial court violated the appearance of fairness doctrine by: (1) admitting "all statements beneficial to [the] prosecution," (2) excluding expert testimony related to diminished capacity and/or voluntary intoxication, (3) failing to draft presentence reports, (4) refusing to set an appeal bond when requested, (5) sentencing him incorrectly, (6) permitting the State to question witnesses for the defense, and (7) permitting the lead investigator for the State to sit through trial before testifying. PRP at 35-40.

We generally review claims of judicial bias under the appearance of fairness doctrine, which states that "'a judicial proceeding is valid only if a reasonably prudent and disinterested observer would conclude that all parties obtained a fair, impartial, and neutral hearing.'" *State v. Bilal*, 77 Wn. App. 720, 722, 893 P.2d 674 (1995) (quoting *State v. Ladenburg*, 67 Wn. App. 749, 754-55, 840 P.2d 228 (1992)). But the party who argues that a judge has a bias must support the claim with evidence; a claim unsupported by such evidence is without merit. *State v. Post*, 118

Wn.2d 596, 619, 826 P.2d 172, 837 P.2d 599 (1992). Thus, before we will apply the appearance of fairness doctrine, Mathes must show such evidence of the trial court's actual or potential bias. *Id*.

The trial court decisions Mathes references do not provide evidence of an actual or potential bias against Mathes, but rather show legal determinations against Mathes's interests or mutual mistakes made by the trial court, the prosecutor, and trial counsel. The record does not support Mathes's contention that he did not receive a fair, impartial, and neutral trial. Thus, Mathes's claim of judicial bias fails.

F.      Prosecutorial Misconduct

To prevail on a prosecutorial misconduct claim in a PRP, Mathes must show both improper conduct and that "the alleged misconduct was either a constitutional error that resulted in actual and substantial prejudice or a fundamental defect that resulted in a complete miscarriage of justice." *In re Pers. Restraint of Lui*, 188 Wn.2d 525, 539, 397 P.3d. 90 (2017). If the petitioner did not object to the alleged misconduct at trial, his claim is considered waived unless the misconduct is "'so flagrant and ill-intentioned that it causes an enduring and resulting prejudice that could not have been neutralized by a curative instruction.'" *In re Pers. Restraint of Caldellis*, 187 Wn.2d 127, 143, 385 P.3d 135 (2016) (quoting *State v. Brown*, 132 Wn.2d 529, 561, 940 P.2d 546 (1997)). We examine the allegedly improper conduct in the context of the total argument, the issues in the case, the evidence, and the jury instructions. *Id*.

The right to a fair trial is a fundamental liberty guaranteed by both the federal and state constitutions. U.S. CONST. amends. VI, XIV; WASH. CONST. art. I, § 22; *In re Pers. Restraint of Glasmann*, 175 Wn.2d 696, 703, 286 P.3d 673 (2012). "Prosecutorial misconduct may deprive a

defendant of his constitutional right to a fair trial." *Glasmann*, 175 Wn.2d at 703-04. A "prosecutor has wide latitude in closing argument to draw reasonable inferences from the evidence and to express such inferences to the jury." *State v. Stenson*, 132 Wn.2d 668, 727, 940 P.2d 1239 (1997). "Closing argument provides an opportunity to draw the jury's attention to the evidence presented, but it does not give a prosecutor the right to present altered versions of admitted evidence to support the State's theory of the case." *State v. Walker*, 182 Wn.2d 463, 478, 341 P.3d 976 (2015).

1.      Late amendment

Mathes argues that the State committed prosecutorial misconduct when it filed an amended information shortly before trial. We disagree.

Generally, the trial court permits the State to amend the information any time before a verdict if such amendment does not prejudice the substantial rights of the defendant. CrR 2.1(d); *Michielli*, 132 Wn.2d at 244. In *Michielli*, the prosecutor had all the information some five months before the defendant's scheduled trial date. 132 Wn.2d at 244. The court could not find any reasonable explanation, other than harassment, as to why the prosecutor waited to add new charges. *Id*. The court, affirming dismissal under CrR 8.3, held that the defendant was prejudiced when he was "forced to waive his speedy trial right and ask for a continuance to prepare for the surprise charges." *Id*. His other alternative was to go to trial unprepared. *Id*.

Here, the evidence in the record does not support a finding of prosecutorial misconduct. There were no surprise charges or unreasonable delays. In fact, the record shows that Mathes's trial counsel acknowledged receipt of an advance copy of the amended information, had no objection to the filing of the amended information, and prepared the defense in anticipation of the amended information. Mathes's right to a speedy trial was not waived, delayed, or violated. His

trial counsel did not claim he was deprived of the opportunity to prepare his defense. In addition, Mathes's counsel advised the trial court that he had reviewed the amended information with his client. Mathes was neither forced to go to trial unprepared, nor forced to ask for a continuance to prepare for the additional charges. Accordingly, Mathes fails to show that the filing of the amended information prejudiced him.

2. _Brady_[11] violations

Mathes also appears to argue that the State committed _Brady_ violations by suppressing evidence that Toste and Detective Green committed perjury and that Roy had extensive criminal history. We disagree.

We review an alleged _Brady_ violation de novo. _State v. Mullen_, 171 Wn.2d 881, 893, 259 P.3d 158 (2011). _Brady_ imposes a duty on the State to disclose material evidence favorable to the defendant. _See_ 373 U.S. at 87. _Brady_ states that the suppression of evidence favorable to an accused violates due process "where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith" of the State. _Id._ To establish a _Brady_ violation, a defendant must demonstrate the existence of each of three elements: (1) the evidence at issue must be favorable to the accused; (2) that evidence must have been suppressed by the State, either willfully or inadvertently; and (3) prejudice must have ensued. _Mullen_, 171 Wn.2d at 895.

In order to show prejudice, the petitioner must show that "'there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" _In re Pers. Restraint of Stenson_, 174 Wn.2d 474, 487, 276 P.3d 286 (2012) (internal

---

[11] _Brady v. Maryland_, 373 U.S. 83, 83 S. Ct. 1194, 10 L. Ed. 2d 215 (1963).

quotation marks omitted) (quoting *Kyles v. Whitley*, 514 U.S. 419, 433-34, 115 S. Ct. 1555, 131 L. Ed. 2d 490 (1995)). "A 'reasonable probability' of a different result is . . . shown when the government's evidentiary suppression 'undermines confidence in the outcome of the trial.'" *Id.* (internal quotation marks omitted) (quoting *Kyles*, 514 U.S. at 434). The petitioner must show "that the favorable evidence could reasonably be taken to put the whole case in a different light." *Id.*

Further, "'[a] *Brady* violation does not arise if the defendant, using reasonable diligence, could have obtained the information' at issue." *Benn*, 134 Wn.2d at 916 (quoting *Williams v. Scott*, 35 F.3d 159, 163 (5th Cir. 1994)).

Even assuming without deciding that Mathes satisfies the first two elements, he cannot show that production of this evidence would have changed the result of the proceeding. Mathes could have potentially used Roy's criminal history to impeach him under the rules of evidence, but this case did not rest on Roy's credibility. Additionally, as previously addressed, Toste and Detective Green did not commit perjury. Accordingly, Mathes fails to show that any alleged *Brady* violations prejudiced him.

### 3. Misstating the evidence

Mathes appears to suggest that the State committed prosecutorial misconduct during its closing argument by arguing that Mathes fired two shots. We disagree.

It is improper for the State to argue facts that are not in evidence. *Glasmann*, 175 Wn.2d at 704-05. But the State is allowed to draw reasonable inferences from the evidence. *Stenson*, 132 Wn.2d at 727.

There was conflicting evidence as to how many shots Mathes fired at the deputies—the forensic investigation recovered two bullets from Mathes's gun, Mathes told deputies he "emptied his gun" during the shootout, Roy testified that he only saw Mathes fire one shot. 3 VRP at 503. During its closing argument, the State acknowledged that the number of shots Mathes fired was up for debate but argued that the evidence showed at least two shots were fired.

> We know at least two shots were fired, maximum of five shots. Why do we know that? Remember Roy Mathes said he only saw one shot fired. We know that can't possibly be true because we know at least there was one other one that went into the house.
>
> So we know at least the one that Roy saw and then we know at least that one there. We also know the defendant said he emptied his gun so that would lead us to believe that more than two were fired.

5 VRP at 751. Whether the totality of the evidence showed that Mathes fired one, two, or more shots was a question of fact left to the jury. The State did not commit prosecutorial misconduct by arguing reasonable inferences from the evidence presented to support its case.

Because there was evidence in the record that Mathes fired more than one shot, we hold that the State did not commit prosecutorial misconduct by arguing that Mathes fired two shots.

### 4. Using fruit of the poisonous tree

Mathes argues that the State committed prosecutorial misconduct by relying on statements Mathes made at the scene and hospital because the statements were unconstitutionally obtained.

However, the admissibility of Mathes's statements at the scene and at the hospital was thoroughly litigated during the CrR 3.5 hearing. Mathes does not argue that the trial court abused its discretion in its ruling. The State is entitled to argue the evidence admitted at trial. Accordingly, we hold that the State did not commit prosecutorial misconduct by arguing the admitted evidence.

40

No. 51736-1-II

5.    <u>Public prejudice</u>

Finally, Mathes argues that the State committed prosecutorial misconduct by making public statements pretrial that could have prejudiced the jury. Specifically, Mathes points to the release of a report clearing the officers involved in the shooting of wrongdoing. However, Mathes provides no evidence that any of the jurors saw the report, let alone were influenced by the report. Accordingly, we hold that Mathes's argument fails.

CONCLUSION

In conclusion, we disagree with all of Mathes's arguments except for his argument that he is entitled to resentencing based on a corrected offender score. Accordingly, we grant in part and deny in part Mathes's petition and remand for resentencing.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Glasgow, C.J.

We concur:

Maxa, J.

Veljacic, J.